UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DONALD WINCHESTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.        ) | CASE NO. 1:04-cv-1153-DFH-WTL |
| ) | |
| ALLISON TRANSMISSION/GMC, ) | |
| RANDY BRAMWELL, TODD POTORFF, ) | |
| ROBERT MITCHELL, RALPH NICHOLS, ) | |
| STEVE ARMSTRONG, and GARY SMITH, ) | |
| ) | |
| Defendants. ) | |

ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In pursuing this age discrimination case, plaintiff Donald Winchester asks the court to referee a long-standing feud between co-workers. Following discovery, the undisputed facts show that there is no viable claim for relief. The summary judgment motion filed on behalf of defendant Allison Transmission/GMC ("Allison") and the similar motion filed on behalf of all the individual defendants must be granted, as explained here in detail.

I.    *Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary

judgment should be granted only where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Only genuine disputes over material facts can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Id.*

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party. See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255; *Conley v. Village of Bedford Park*, 215 F.3d 703, 708 (7th Cir. 2000). Because "summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court's only task is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.*

II.     *Undisputed Facts* [1]

Plaintiff Donald Winchester began working for General Motors at its Indianapolis Allison Transmission facility in 1966.  He is currently 67 years old and remains an hourly employee at the plant working as a mechanic.  As an hourly employee in the plant bargaining unit, he is represented by the United Auto Workers and works under a collective bargaining agreement.

According to Winchester, in the mid-1990's, foreman Rocky Laux began to ask him when he would be retiring.  These questions came frequently from Laux until Winchester informed him that the questions offended him.  Winchester also believes Laux treated him less favorably with regard to overtime assignments.  He associates the biased treatment with age because when he complained to Laux,

---

[1]The local rules require that the party responding to a summary judgment motion include a section in his brief "labeled 'Statement of Material Facts in Dispute' which responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment."  S.D. Ind. Local Rule 56.1(b).  Plaintiff has not done that.  He has included a section in his brief entitled "Facts," which sets out the facts in a light most favorable to him, but the local rule requires more.  More direct responses are needed to focus the attention of both the parties and the court on which facts are truly being disputed; hence, the rule's provision that "the Court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy" if they are not specifically controverted in the opposing party's "Statement of Material Facts in Dispute."  The court has referred to plaintiff's "Facts" in an attempt to determine if there are any material disputes and has examined the facts in a light most favorable to him.  However, where it was unclear whether a specific factual statement set forth by defendant was being contested, the court has assumed the statement was true.

the foreman told him: "If you don't like it, retire." Laux was Winchester's foreman from 1995 until 2001.

Winchester claims that the departure of Laux did not end his age-related problems. The garage where Winchester and four other mechanics work is located approximately 100 yards from the main Allison facility. The foreman is not regularly present but checks in from time to time. Winchester began having problems with younger co-workers in 2001, following an incident where he complained to his new foreman about his co-workers having a radio on in the garage. After his complaint to the foreman, the co-workers began calling him names and making threatening or vulgar remarks. Winchester did not back down. This verbal sparring has continued over the years. Comments have been made regarding Winchester's grey hair, and he has been told by a couple of the individual defendants that he was "too damn old" or has been addressed as "old man."[2]

According to some of Winchester's younger co-workers, the individual defendants in this lawsuit, Winchester is no novice at name-calling and was in fact an instigator of many rounds of verbal sparring. According to defendants

---

[2]Allison has objected to the evidence of these comments as hearsay. It is not. The comments are not out-of-court statements being offered to prove the truth of the matters asserted. See Fed. R. Evid. 801(c) (defining hearsay). The statements are evidence of what Winchester claims has been a hostile work environment based on his age. For that purpose, they are not hearsay, and the relevant fact is that they were made at all.

Steve Armstrong and Gary Smith, certain of Winchester's actions drove them and others to complain to management. On February 9, 2001 a meeting was held where Armstrong, Smith and two other employees in the garage (neither of whom is a defendant in this lawsuit) provided a long list of complaints against Winchester. Among many others, those complaints included hiding equipment, laughing at and making derogatory comments to fellow employees, staring at and following co-workers, exerting control over the heating and air conditioning, and locking others out of the garage when they leave. Armstrong complained specifically of Winchester's vulgar comments to him and said that he found the garage to be a hostile environment.

When approached by management with the complaints of his co-workers, Winchester denied most and blamed them for the unpleasant atmosphere in the garage. He also claimed that Armstrong had solicited the others to complain along with him because Armstrong blamed Winchester for his assignment to the "office" and because he disliked Winchester due to his age. After the company's investigation, Winchester was warned that his conduct might violate the GM Workplace Violence Policy, which forbids harassment, and that further incidents might result in discipline.

Winchester is not the most senior employee in the garage area. Robert Collister, 72 years old, is a laborer who also works in that area. His affidavit states that at times he too has been harassed and insulted. Collister points to

-5-

defendants Randy Bramwell and Todd Portoff as the two who were particularly abusive towards him, calling him "old man", "cripple," or "hop-along Cassidy," and sometimes showing him their middle fingers.  He confirms that the two were even more abusive toward Winchester, because "Don stands up to them and complains to management about them."

David Shillings, 59 years old, transferred to Allison as a mechanic from another GM plant.  Though he was not permanently assigned to the garage area, on occasion he would need help from Winchester or others and would venture into the garage.  When he did, he states, defendants Bramwell, Pottorf, and Robert Mitchell would make fun of him or hide tools from him.  He too says that his seniority miffed the younger employees and they "have never forgiven me for it." Both Shillings and Collister testify by affidavit as to their belief that the foundation of the problem is the fact that if a lay-off were to occur (and several have) their superior seniority would allow them to keep their jobs when the younger employees might lose their jobs.  With Winchester and his younger co-workers actively challenging and reporting their respective derogatory words and actions, the stage was set for the practical jokes, pranks, and annoyances that began to accompany the verbal exchanges.

Plaintiff was disciplined in May of 2002 after defendant Ralph Nichols reported that Winchester had used "foul and abusive language" in addressing him as "f***ing boy" and directing him to "f***ing do this and f***ing do that."  The

allegation of such vindictive use of profanity resulted in Winchester's being sent home for the balance of a shift and the following day.  Winchester successfully grieved his discipline.  He then complained to Superintendent Paul Guinen that Nichols used profanity in addressing him.  A meeting was held with Winchester, Nichols, their foreman at the time, Mark Rhoder, and a union representative.  At the meeting, management emphasized that all employees needed to cooperate and work together.  Also, according to Winchester, Nichols admitted in the meeting to his use of profanity and agreed that he had wagged his finger at Winchester.  Winchester complains that the admission resulted in no discipline for Nichols.

Plaintiff and defendant Bramwell became particularly at odds in April 2003.  After Bramwell had performed a safety inspection of a cart and tagged it as passing, Winchester performed routine maintenance on the same cart and noticed the horn was not working and that some wiring was exposed.  He then tagged the cart as unsafe and reported to the foreman that Bramwell had inappropriately tagged the cart as safe.  Learning of this, Bramwell was angered and approached Winchester in a threatening manner and told him that if Winchester ever checked over Bramwell's work again, it would be the last thing he ever did.  Winchester reported the threat to foreman Rhoder, who confronted Bramwell.  Bramwell denied the incident.  Winchester then told Mary Coari in Labor Relations of the incident.  After her investigation, Bramwell was given a warning regarding the GM Workplace Violence Policy similar to the warning Winchester had received after the first time he was accused of verbal abuse.

Over time, mild pranks such as beeping Winchester for non-existent phone calls were followed by more annoying tactics.  A cart Winchester was using had its steering wheel coated with grease.  The phone at the desk typically used by Winchester had its receiver greased and Winchester fell victim to the prank when he tried to answer the phone.  Tools, trucks and carts were hidden so as to cause delays in Winchester's and Collester's projects. In August 2003, Winchester found what he believed to be feces on the desk where he would often work.  Security investigated but opined that the substance was dried grease and oil that someone had exposed to water and shaped to resemble feces.   Winchester reported nearly all of the incidents, but, as he admits, it was impossible to know which one of his co-workers was responsible.   No one was specifically held accountable by the company after it investigated the complaints.   In addition to the six younger mechanics and laborers who regularly worked out of the garage, other employees could freely enter and exit the area.

On September 9, 2003, Winchester found a dead pigeon in his lunch-box. Again, security personnel investigated.  No culprit could be linked to the bird, and Allison took no disciplinary action against any employee. Not long after the incident, Winchester began receiving mailed brochures at his home from resorts in Pigeon Forge, Tennessee and from the National Pigeon Society.  After the dead bird incident, Ralph Nichols began whistling the tune "Rockin' Robin" when Winchester was around.  Winchester also received a text message on his pager which read "Robin," which Winchester believed was a reference to the dead bird.

Winchester pointed out Nichols' suspicious whistling to his supervisor, but neither Nichols nor anyone else was disciplined.  The company continued to investigate the incident and even tried (unsuccessfully) to determine if any telephone or internet solicitation of the brochures had originated at the plant when Winchester reported receiving the pigeon-related brochures in his home mail.  No one was ever identified as being the person responsible for the prank.

On November 21, 2003, Winchester filed a charge of age discrimination with the Indiana Civil Rights Commission.  The charge read:

> I have worked for Allison Transmission since 1966, and I am currently an Auto Truck and Trailer Mechanic.
>
> Since early 2003 I have been harassed by co-workers after I reported my co-workers violating the local agreement on radios at work.  Each incident of harassment has been reported to security and supervisors Mark Rhoder and Gil Zogby.  The harassment has included threats, a dead pigeon placed in my lunch box and human feces on my desk.  The company has not investigated my complaints in a manner similar to other reports of harassment.
>
> Although Randy Bramwell (age 40 something) was witnessed threatening me he was not disciplined.  I was falsely accused of workplace violence twice in the last two years and I was suspended and had to file a grievance to resolve the matter.
>
> I am also given heavier work assignments along with a 70 year old co-worker while the other five Auto Truck and Trailer Mechanics get to ride around in carts and do light duty preventative maintenance and safety inspections.  My requests for the light duty assignments have been denied.
>
> I believe that I have been discriminated against due to my age, 65, in violation of the Age Discrimination in Employment Act.

After receiving his right to sue letter, Winchester filed this lawsuit. He claims that Allison violated the Age Discrimination in Employment Act ("ADEA") by failing to address co-worker age harassment, which was causing him to be subjected to a hostile work environment. Invoking the court's supplemental jurisdiction, he sues his co-workers under state law for intentional infliction of emotional distress.

III.   *Discussion*

Not all offensive workplace behavior violates the law. See *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (Title VII is not a code of civility); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001) (Title VII "is not a 'general civility code' designed to purge the workplace of all boorish or even all harassing conduct"); *Holman v. Indiana*, 211 F.3d 399, 404 (7th Cir. 2000); *Smith v. Sheahan*, 189 F.3d 529, 532 (7th Cir. 1999). The point is made most often in claims of sexual harassment under Title VII of the Civil Rights Act of 1964, but it applies with equal force under the Age Discrimination in Employment Act and the common law of Indiana. The court's coercive processes and remedies do not provide the right forum for persuading people to treat one another with respect or even simple decency. Our aim is lower here.

A.   *Intentional Infliction of Emotional Distress*

The individual defendants contend that even if everything claimed by Winchester were true, he has alleged no conduct sufficiently outrageous to recover

-10-

under Indiana tort law.  Also, Winchester admits that he has no way of proving which of the individual defendants was responsible for the most offensive conduct alleged, placing the dead bird in his lunch box and the alleged feces on the work desk.

Intentional infliction of emotional distress is difficult to prove.  A plaintiff must show (1) extreme and outrageous conduct (2) engaged in intentionally or recklessly, which (3) causes (4) severe emotional distress to another.  *Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. App. 1999).  Though Indiana courts, including the Supreme Court of Indiana, have recognized the existence of such a tort, they have warned that it applies only in extreme circumstances.  See, *e.g.*, *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (affirming summary judgment for defendant who carried gun in a holster for confrontation with plaintiff and grabbed for the gun and shook it at plaintiff without removing it from holster).  This  court is unaware of any Indiana Supreme Court decision affirming an award under such a tort theory when challenged on appeal.  "Liability has only been found where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Bradley*, 720 N.E.2d at 753.

In assessing whether conduct is so outrageous and intolerable as to be actionable, most courts take into account the totality of the circumstances, including workplace environment if the conduct is job related, the relationship

between the parties, and any supervisory involvement.  See *Lightning v. Roadway Express, Inc.*, 60 F.3d 1551, 1558 (11th Cir. 1995) (applying Georgia law and affirming verdict for employee who was target of repeated curses by supervisor and was hospitalized for paranoid delusions); *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1559 (10th Cir. 1995) (applying Oklahoma law and affirming summary judgment for employer); *Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993) (applying Michigan law and reversing dismissal on pleadings).  That is to say that the language and acts that one might find intolerable when coming from a supervisor or in a retail store or office environment may not be as subjectively outrageous when they occur between co-workers on an oil rig or in a factory.  The name-calling, telephone pranks, and even verbal exchanges in threatening tones are clearly, as a matter of law, not actionable conduct in almost any environment.  The dead bird incident and the feces placed on the desk, if it was indeed feces, push the limit of non-actionable conduct.  Those actions were beyond sophomoric.  However, given the environment of a factory and the context of co-workers, including Winchester, who were clearly trying to outdo each other in their efforts to irritate and inconvenience one another, even those actions fall short of being actionable under Indiana law.

Winchester describes the actions of his coworkers as being "very childish", "annoying" and "harassing."  If his account of the facts is true, as the court must assume, those adjectives are accurate, but they do not describe conduct so deplorable as to shock and outrage a typical person in the same circumstances.  "Indiana courts have been reluctant to award damages for intentional infliction of

emotional distress in employment cases," *McCreary v. Libbey-Owens Ford Co.,* 132 F.3d 1159, 1167 (7th Cir. 1997), and this court is equally reluctant to allow a claim such as this to proceed where, in the aggregate, the conduct can most readily be described as workplace "horseplay."

Even if the Indiana Supreme Court were willing to categorize the conduct differently, Winchester faces another obstacle on his state law claims.  He asks the court to look past his inability to prove that any particular defendant was responsible for the placement of the feces or the dead bird.  He wants the court to apply the principles of *res ipsa loquitur* to allow a jury to find that all of the individual defendants are liable.  The doctrine of *res ipsa loquitur* simply does not apply to a case like this.  First, while it may seem  likely that one or more of the individual defendants is responsible for the pranks, there can be no legal presumption of that fact.  In addition, *res ipsa loquitur* is a negligence doctrine and here the court is dealing with a tort that requires that the defendant have intended to harm another person.  *Cullison*, 570 N.E.2d at 31.  Finally, application of the doctrine is generally limited to situations where the defendant had exclusive control of the means that caused the injury or the place where the injury occurred.  *Maroules v. Jumbo, Inc.*, 452 F.3d 639, 643-44 (7th Cir. 2006).  That is not the case here.  In short, even if the conduct were sufficiently outrageous to be actionable, Winchester cannot make his case without proving which of the several defendants were responsible and also harbored an intent to injure him emotionally.

-13-

Then there is the requisite element of "severe emotional distress." That requirement implies more than a person being angered, offended, appalled, or even shocked. It connotes an emotional condition that threatens an individual's mental health. Here, Winchester has offered no evidence other than his own testimony as to the emotional effect of the incidents at issue. He has sought no help from a mental health professional or the clergy. He speaks only of his doctor indicating that stress has been a cause of his diabetes. He has made no mention of the events he complains of to any medical professional, including his family doctor. He has missed no work and has not considered quitting because of the conduct, despite being eligible for full retirement. Winchester's tort claims against his co-workers fail as a matter of law.

B.   *Hostile Work Environment/Age Harassment*

This case is in federal court under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* Winchester alleges that Allison is liable to him for having subjected him to a hostile work environment based on his age. The ADEA has no specific provisions prohibiting co-worker age harassment or addressing a hostile work environment. However, most courts faced with the rare "age harassment claim" have been willing to assume that, as with race or gender claims under Title VII, a hostile work environment may provide the basis for a discrimination claim under the ADEA. 2 Howard C. Eglit, *Age Discrimination* § 7:11 (2d ed. 2005). The Seventh Circuit has "assumed, but never decided, that

-14-

plaintiffs may bring hostile environment claims under the ADEA." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005).[3]

Assuming that an age-based hostile environment claim is actionable, the court applies the same legal requirements that apply to hostile environment claims based on race or sex.  Winchester must offer sufficient evidence to support a determination:  (1) that he was subjected to harassment; (2) that the conduct was unwelcome; (3) that the conduct occurred because of his age; (4) that the conduct was sufficiently severe or pervasive that a reasonable person would find the work environment to be hostile or abusive; (5) that at the time the conduct occurred, Winchester believed that it made his work environment hostile or abusive; (6) that Allison knew or should have known of the conduct; and (7) that Allison did not take reasonable steps to correct the situation or to prevent the conduct from recurring.  *Kriescher v. Fox Hills Golf Resort and Conference Center*, 384 F.3d 912, 915 (7th Cir. 2004); *Rizzo v. Sheahan*, 266 F.3d 705, 712 (7th Cir. 2001).

---

[3]Allison argues that Winchester never raised a hostile environment claim until responding to its summary judgment motion.  Both the agency charge of discrimination and the complaint in this matter contain allegations sufficient to put Allison on notice that Winchester is claiming that the company failed to stop his co-workers from harassing him based on his age.  That is the essence of a hostile environment claim.  On the other hand, Allison is correct that Winchester abandoned any claim of disparate treatment based upon how he was treated directly by Allison management and his supervisors.  Winchester's failure to defend any such claim in his responsive brief results in abandonment, and Allison is entitled to summary judgment on any such claim.  *See Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003).

Winchester has no problem meeting the first two elements.  There is evidence that he was harassed and that the harassment was unwelcome.  He cannot meet the third element.  The link between any harassing conduct and Winchester's age is negligible at best.  The individual defendants all engaged in vulgar exchanges and name-calling (as did Winchester early on).  Every so often, one of the defendants might address him as "old man" in a derisive fashion.  Additionally, Mitchell made a derogatory suggestion that Winchester dyed his hair and Pottorff commented several times to the effect that Winchester was "too old to continue working at the facility and too dumb to quit."  Other than these stray comments, the nexus between the harassment and Winchester's age is pure speculation on his part.[4]  None of the other vulgarities or threats he complains of had any apparent connection to his age, and the limited comments of Mitchell and Pottorf are insufficient to form the basis for finding that there was an objectively hostile environment.  See *Racicot*, 414 F.3d at 677-78 (affirming summary judgment for employer on age-based hostile environment claim).

Perhaps most telling is Winchester's own statement that his problems with the individual defendants began when he complained to management that they

---

[4]Plaintiff does refer to the age-based comments made by Rocky Laux, his supervisor in the mid-1990s.  Laux often asked him when he was going to retire and acted more hostile toward him when he answered that he had no such plans.  This falls short, without more, of what the law or this court would view as harassment based on age.  Moreover, it is also conduct which occurred so far outside the 300 day period prior to his filing of an agency charge that Winchester may not rely on it to support the harassment claim raised in his charge, which is based on an entirely different type of conduct by different actors.  See *Filipovic v. K&R Exp. Systems, Inc.*, 176 F.3d 390 (7th Cir. 1999).

were violating the rule against having radios playing in the garage.  The undisputed evidence shows that at the root of the verbal attacks, threats, and pranks that immediately followed was the conflict between Winchester and several of the individual defendants with respect to their desired work environments. That conflict is even better exemplified by Winchester's complaint that after he would set the heating or air conditioning level for the garage where he wanted it, Smith would turn it up or down; meanwhile, Smith and Armstrong registered the same complaint to management with respect to Winchester.

Plaintiff has supplied affidavits from two other older employees who have worked in the garage, Collester and Shillings, in support of his claim that the harassment has been based on age.  Even so, the speculation in those affidavits is that the problem the individual defendants had with them and with Winchester is based upon differences in seniority under the collective bargaining agreement. Says Collester: "They resent us because of our age.  We have much more seniority than they do and if there is a layoff they would go first."  While seniority often correlates with age, the two are not one and the same for purposes of age claims under the ADEA.  See *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611-12 (1993). If jealousy over seniority spawned the pranks and visceral utterances at issue here, that too falls short of satisfying the third element of a viable hostile environment claim.

Winchester has not offered evidence that would allow a reasonable jury to find that, were it not for his age he would not have been the victim of co-worker harassment.  The absence of such evidence is fatal to his claim.  See *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) (affirming summary judgment for employer on age hostile environment claim).  Further, the evidence would not support a determination that Allison knew that the harassment Winchester reported was based upon his age.  It would certainly behoove Allison to address any harassment reported by its employees, but federal discrimination laws do not hold it liable for failing to cure harassment based on something other than a characteristic protected by statute.  Without evidence that Allison knew of ongoing age-based harassment and failed to address it adequately, the sixth and seventh elements of a hostile environment claim are also missing.

IV.    *Conclusion*

For the reasons stated above, neither the ADEA nor the common law theory of intentional infliction of emotional distress provide plaintiff Winchester with a means to recover damages from Allison or the individual defendants.  Allison's Motion for Summary Judgment (Document No. 62) is GRANTED, as is the Motion for Summary Judgment filed on behalf of Defendants Bramwell, Pottorff, Mitchell, Nichols, Armstrong and Smith (Document No. 66).  Final judgment will be entered in favor of the defendants.

So ordered.

Date: August 22, 2006

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Hon. William T. Lawrence
277 Birch Bayh U.S. Courthouse
46 East Ohio Street
Indianapolis, Indiana  46204

Heather Renee Hamilton Gill
LATHROP & GAGE LC
hgill@lathropgage.com

Jane Ann Himsel
WOODEN & MCLAUGHLIN LLP
jhimsel@woodmaclaw.com

Jeffrey S. McQuary
BROWN TOMPKINS LORY
jmcquary@brown-tompkins-lory.com

Richard A. Rocap
ROCAP WITCHGER, LLP
rar@rocap-witchger.com

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@swh-law.com

David Christopher Vogel
LATHROP & GAGE L.C.
dvogel@lathropgage.com